UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\*\*\*

| | |
|---|---|
| LUIS GONZALAS, | Case No. 2:17-cv-01653-RFB-EJY |
| Petitioner, | **ORDER** |
| v. | |
| JEREMY BEAN,[1] *et al.*, | |
| Respondents. | |

## I.   Introduction

Luis Gonzalas ("Petitioner" or "Gonzalas") filed a <u>pro se</u> habeas corpus petition under 28 U.S.C. § 2254. ECF No. 18. This matter is before the Court for adjudication on the merits.

Gonzalas testified he shot and killed T.A. in self-defense when T.A. reached for a firearm he earlier displayed under his shirt while threatening to kill Gonzalas during their confrontation.[2] ECF No. 25-1 at 23, 30. Although police found a knife with an eight-inch blade in T.A.'s pocket, they found no firearm. ECF Nos. 23-2 at 44–46, 52, 54–55; 23-1 at 27. A jury convicted Gonzalas of first-degree murder with use of a deadly weapon and he was sentenced to prison for 20 years to life. ECF Nos. 25-18; 27-16. The state supreme court affirmed the convictions on direct appeal and in postconviction proceedings. ECF Nos. 27-6; 29-23. In his amended petition, Gonzalas asserts the following grounds for relief:

---

[1] According to the state corrections department's inmate locator page, Gonzalas is incarcerated at High Desert State Prison. The department's website reflects Jeremy Bean, Ronald Oliver, Julie Williams, and James Scally, are each Associate Wardens for that facility. At the end of this order, the Court directs the clerk to substitute Jeremy Bean, Ronald Oliver, Julie Williams, and James Scally, for respondent, Brian Williams, under, <u>inter alia</u>, Rule 25(d) of the Federal Rules of Civil Procedure.

[2] T.A.'s mother, Lidia Trejo, testified T.A. was 17 years old when he died. ECF No. 23-1 at 68–69. The Local Rules of Practice state that "[p]arties must refrain from including—or must partially redact, where inclusion is necessary—[certain] personal-data identifiers from all documents filed with the court, including exhibits, whether filed electronically or in paper, unless the court orders otherwise." LR IA 6-1(a). This includes the names of minor children, thus, only a child's initials should be used. <u>Id.</u> "T.A." was the victim in this case, and a minor, at the time the events occurred. Pursuant to the Local Rules, the Court will identify him exclusively by his initials.

Ground A(2): Counsel were ineffective in violation of the Sixth Amendment because, although they successfully moved to exclude evidence of Gonzalas's gang affiliation, they opened the door to introduction of that evidence by presenting evidence of Gonzalas's good character.

Ground A(3): Counsel were ineffective in violation of the Sixth Amendment because they failed to object to the introduction of evidence of Gonzalas's gang affiliation on the grounds it violated his right to free association under the First Amendment.

Ground B(2): The state district court violated his Sixth Amendment right to compulsory process by excluding as a discovery sanction the testimony of Brandon Contreras concerning T.A.'s character for threats and thievery.

Ground B(3): Counsel were ineffective in violation of the Sixth Amendment because they failed to timely notice Brandon Contreras as a witness.

ECF No. 18. The Court will deny the petition but grant a certificate of appealability.

## II. **Background**[3]

### A. **Character Evidence**

T.A.'s landlady, Maria Enriquez, testified T.A. and Gonzalas lived with her and her children at her apartment prior to T.A.'s death on September 17, 2006. ECF No. 23-2 at 100–01. Enriquez said T.A. was "quick to fight," would fight anyone who disrespected him, and "didn't let nobody disrespect" her. ECF Nos. 23-2 at 100; 23-3 at 10. She said she never saw T.A. with a gun, but believed he had one because she heard him tell others that he had a "strap," i.e., a gun. ECF Nos. 23-2 at 100; 23-3 at 7–10.

Enriquez's daughter, C.E.,[4] testified she believed T.A. had two guns that he kept in a closet or her mother's room, and that Gonzalas had the opportunity to see the guns while living at her family's apartment. ECF Nos. 23-1 at 77; 23-2 at 10–11. C.E. said she saw T.A. with a gun on the night he was killed but she went to sleep at 1:00 a.m. ECF Nos. 23-1 at 78; 23-2 at 12.

Neighbor, Alicia Rivera, testified T.A. "wanted to dominate over everyone" and his reputation in the neighborhood was "a bad one," because he was reputedly "a thief," who

---

[3] The Court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or statements of fact in the state court. The Court summarizes the same solely as background to the issues presented in this case and does not summarize all such material. No assertion of fact made in describing statements, testimony, or other evidence in the state court constitutes a finding by this Court. Any absence of mention of a specific piece of evidence or category of evidence does not signify the Court overlooked the evidence in considering the claims.

[4] C.E. was 14 years old at the time of the shooting. ECF No. 23-1 at 88; see supra, n.2.

threatened people with guns. ECF No. 23-5 at 12–13. Her personal opinion was that T.A. "was a dangerous person" and "everybody was scared of him." Id. at 13.

Codefendant, Maria Mojica, testified T.A. had a neighborhood reputation as a thief and as "an LA gangster that came on here trying to be a like a boss," who "wanted to take over," and "wanted to win his respect real fast," and "didn't want people treating him like a youngster."[5] ECF No. 23-6 at 4–5. She said he "was a very violent person," who "would quick snap in just a second," and "hurt you the deepest and not care" but then apologize. Id. at 5. Mojica said when T.A.'s girlfriend was eight months pregnant, Mojica saw T.A. "grab her" with a gun, and when his girlfriend said the gun was fake, he said, "Oh, yeah?" and shot the gun. Id. at 5–6. Mojica said T.A. and her brother, Shorty, "always fought when they were drunk." ECF No. 23-5 at 18–19.

Gonzalas's then girlfriend, Luci Martin, testified she saw T.A. and Shorty fistfight on two occasions. ECF No. 23-2 at 61–63. Martin also testified that about a month before T.A.'s death, Mojica said she wanted to kill T.A. because he fought with Shorty. Id. at 63–64, 77–78. Martin said Gonzalas told Mojica, "'Yes' to calm her down" and told her "they were going to do it but not at that time." Id. at 64, 76, 81. Martin told police she heard Mojica and Gonzalas say these things with her "own ears," but also told police she "wasn't there" and testified at trial she "wasn't there" but that "later on they said that." Id. at 78, 80–81, 94. When asked if she thought Gonzalas's comments to Mojica meant he agreed to kill T.A., Martin testified "I don't know. I think so," but later said she thought Gonzalas "was calming [Mojica] down" and she did not know if Gonzalas's comments constituted an agreement with Mojica. Id. at 81, 96–97.

Defense counsel elicited C.E.'s testimony that Gonzalas was "a calm person" and "a nice guy" who helped her mother with the children and clean the apartment. ECF No. 23-1 at 91–92. Enriquez testified Gonzalas enjoyed a reputation in the neighborhood as "a nice guy," she never knew him to be violent, he was extremely good with her kids, and he helped clean the apartment. ECF No. 23-3 at 3–4. Neighbor Rivera testified Gonzalas's nickname was "Loco," and he enjoyed

---

[5] On the Friday before Gonzalas's trial, Mojica entered a plea under North Carolina v. Alford, 400 U.S. 25 (1970) to assault with a deadly weapon and accessory to murder for the killing of T.A. ECF No. 21-20 at 11–15.

a reputation as a "quiet" and "calm person" who was "very diligent," "not offensive" and did not seek fights. ECF No. 23-5 at 12, 14.

**B. Gonzalas and T.A. had a falling-out.**

Gonzalas testified T.A. threw Gonzalas's cat at a wall while they were living at Enriquez's apartment. ECF No. 25-1 at 9. Gonzalas said he got mad, and confronted T.A., but T.A. was drunk and tried to fight him. Id. at 10. Gonzalas said he went to the bathroom to calm down and avoid a fight, but when he emerged, T.A. was waiting and asked if he wanted to "go out" and "handle it." Id. at 10–11. Gonzalas said he told T.A. he would not fight with him while he was drunk and that he preferred to wait and talk about it, and T.A. left without a word. Id. Gonzalas testified later that day, Shorty drove T.A. to a 7-Eleven store while Gonzalas accompanied them in a separate vehicle. Id. Gonzalas said T.A. told Shorty he was going "jack (steal) some beer" from the store but Shorty told him "I ain't going to be part of that" and left T.A. at the 7-Eleven. Id. at 11–12. Gonzalas said they caravanned back to the apartment to drop off T.A.'s sister and saw T.A. walking without beer on their return trip. Id. Gonzalas said T.A. ran to Shorty's vehicle and hit Shorty[6] until Shorty sped away. Id. Gonzalas said T.A. ran to Gonzalas's vehicle, but he too sped away. Id. Gonzalas said he did not want to return to his apartment because he knew T.A. had a gun. Id. at 13. Gonzalas said he and Martin spent time in Los Angeles with Mojica so T.A. could cool off, and he hoped he could later talk to T.A. and "fix things." Id. at 13–14.

**C. Gonzalas shot and killed T.A.**

Gonzalas, Martin, and Mojica, returned to Las Vegas on the night before the shooting and socialized with Gonzalas's friend, Clever. ECF Nos. 23-2 at 65–66; 25-1 at 15–17. Gonzalas said during that night, two people told him T.A. said he was going to kill him. ECF No. 25-1 at 18. Knowing T.A. "always carries a gun," Gonzalas said he obtained a shotgun to "protect" himself. Id. at 18–19. He said he "never got the gun with the intentions to kill nobody" and denied he obtained the gun with the intention to kill T.A. Id. at 19–20. With the gun in the car, the four continued their night of drinking. Id. Around 6:00 a.m., Gonzalas asked Mojica to drive him to

---

[6] It appears the transcript incorrectly states T.A. hit "Maria's sister," as Gonzalas later clarified he said T.A. hit Maria's "brother," i.e., Shorty. ECF No. 25-2 at 23–24.

4

Enriquez's apartment. Id. at 20–21. Although concerned enough about T.A.'s threats to obtain a gun, Gonzalas said he needed a place to live, "didn't have a choice," and thought he might be able to talk with T.A. and live with Enriquez and T.A., or with a neighbor. Id.

Gonzalas testified they arrived at the apartment, he and Mojica exited their vehicle, and he saw T.A. exit the apartment while looking at him. Id. at 21. He said T.A. returned to the apartment and said, "Hey, look, that mother f'er is here." Id. at 21–22. Enriquez testified Blythe Street Gang members, Monster, Bones, and Snoopy, and other friends, were partying with T.A. at the apartment that night. ECF Nos. 23-2 at 102–06; 23-3 at 6–7. Gonzalas said T.A. returned outside, looked at him, and asked, "Well, what's up, you f'ing piece of s . . . t? What's up, mother f'er?" ECF No. 25-1 at 22. Gonzalas said he saw Mojica go to the patio and hug T.A., but T.A. kept walking on the patio, saying things to Gonzalas like, "You should ask your wife when I was putting my d . . k in her ass" and "Oh yeah, we throw a f'ing train on that b . . . . h." Id. Gonzalas said he just smiled and couldn't believe T.A. was saying all those things. Id. Gonzalas said at one point, T.A. told him he had "a f'ing bullet" for his brain, "pull[ed] out his shirt," and showed Gonzalas a gun. Id. at 23. Mojica testified she could tell T.A. was "spun" and "felt the gun" when she hugged him as it "practically kind of hit [her]." ECF Nos. 23-5 at 22; 23-6 at 10. Gonzalas said he tried to talk to T.A and told him "Hey, fool . . . we can talk about this." ECF No. 25-1 at 23.

Martin testified she remained in the backseat of the vehicle with the gun and heard T.A. tell Gonzalas he was "going to kill him" and "a lot of insults" yet Gonzalas did not reach for the gun in the vehicle. ECF No. 23-2 at 67, 69, 85, 87–88. Mojica likewise testified T.A. threatened Gonzalas, saying, "I've got a bullet for you, I'm going to f'ing kill you, you mother f'er" and "you better not come down you pussy" but Gonzalas just stood at the vehicle. ECF Nos. 23-5 at 22; 23-6 at 1. At some point, people came out of the apartment, and Clever left Mojica's vehicle, went to the patio, and pushed T.A. because T.A. said, "F . . . you, and whoever you're with." ECF Nos. 23-6 at 1; 25-1 at 23–25. T.A. and Clever started fighting and Mojica and the others who had exited the apartment joined the fray. ECF Nos. 23-6 at 1; 25-1 at 26.

Gonzalas testified he went to the patio but left the gun in the vehicle because he didn't see T.A. go for his gun during the fight with Clever, and Gonzalas thought perhaps he and T.A. could

handle their problem with a fistfight. ECF No. 25-1 at 26–27. Gonzalas said T.A. was "big"[7] and although T.A. might "kick" his "ass" maybe they could end the problem. Id. Gonzalas said when he arrived at the patio, everyone was "up already," and he and T.A. hit each other until Gonzalas blacked out. Id. at 27–29. Enriquez testified her daughter awakened her and she saw T.A. and Gonzalas fist fighting on the patio without weapons. ECF No. 23-2 at 106–09.

Martin testified that Mojica returned to the car, said she was going to kill T.A., and grabbed the shotgun. Id. at 73–74. Martin said Mojica pointed the gun at T.A. and told him she was going to kill him. Id. at 70–71. Gonzalas testified after he and T.A. stopped fighting, he saw Mojica shaking and moving the gun around, but he could not tell where she was pointing it, so, as she "had been drinking the whole night," he took the gun away from her. ECF No. 25-1 at 29–30. Gonzalas said when he turned back to T.A, he saw him "reaching for his gun" and Gonzalas said he "just shot him." Id. Gonzalas said even though "he didn't see no gun" in the moment he shot T.A., he shot him because T.A. showed him a gun earlier in the confrontation, and when Gonzalas saw T.A. reaching for it, he got "scared" believing T.A was going to shoot him. ECF Nos. 25-1 at 30; 25-2 at 15–19. Gonzalas explained that he shot more than once because "everything happened so fast" and he had seen "the gun on T.A.'s hand when he was in the patio walking back and forth and told Gonzalas I got a bullet for your brain," and when T.A. had "pulled out his shirt and hold [sic] the gun." ECF No. 25-2 at 15–19.

Enriquez witnessed the shooting and testified she did not see T.A. with a weapon, and he "stood just against the wall with his hands down." ECF No. 23-2 at 109–10. She said she told Gonzalas "two or three times to please don't shoot him," but Gonzalas looked at her, looked at T.A., and then shot T.A. two or three times. Id. Gonzalas said he did not see Enriquez and did not hear her say, "please don't shoot him." ECF No. 25-2 at 36.

C.E. testified Monster, Bones, and Snoopy, and a friend named Jessica, ran off when the shots were fired. ECF No. 23-2 at 7–8. Martin testified she also saw four or five people run off when shots fired. Id. at 88–89. Enriquez testified she saw Gonzalas and Mojica run away and leave in Mojica's vehicle and said someone "could have" taken something off the patio before police

---

[7] T.A.'s mother testified T.A. was six feet tall and weighed 250 to 260 pounds. ECF No. 23-1 at 68–69.

arrived. ECF No. 23-3 at 1, 38. Martin testified she, Gonzalas, Mojica, and Clever, drove away but Gonzalas stopped and "hid the gun" "under a trash can." ECF No. 23-2 at 72–73. She said Gonzalas and Mojica were nervous, Gonzalas laughed, and they asked whether T.A. was dead. Id.

### D. Investigation

Las Vegas Metropolitan Police Department ("Metro") Officer Kenneth Viano found T.A. "crouched" dead with no weapons visibly present. ECF No. 23-1 at 21–27. He found a coat and hat at the scene, indicating someone might have fled, and agreed items could have been taken from the scene before his arrival. Id. at 39–40. Former Metro crime scene analyst, Leanna Risso, recovered "a rather large kitchen knife" with an eight-inch blade from T.A.'s back pocket, but found no firearm at the scene, on T.A., or in the apartment. ECF No 23-2 at 31, 44–46, 54–55. She agreed she had no way to know whether someone corrupted the scene or not. Id. at 56.

Medical Examiner Dr. Piotr Kubiczek said T.A. died from "multiple shotgun wounds." ECF No. 23-1 at 42–43, 55. He said T.A.'s blood tested positive for an intoxication level of methamphetamine and a small amount of alcohol. Id. at 62. Kubiczek found a close range "contact" shotgun wound to T.A.'s left cheek with indications the gun was either touching, or very close, to the skin when it went off. Id. at 47–49. He found a second contact wound to the back of T.A.'s head and a third shotgun wound to T.A.'s right shoulder. Id. at 50–53.

Metro Sergeant Michael Wallace's video-taped interview with Gonzalas was played for the jury. ECF No. 23-4 at 9, 17. Wallace testified Gonzalas denied all involvement so Wallace introduced the idea of self-defense because he thought doing so would minimize Gonzalas's culpability in Gonzalas's mind and lead him to tell the truth. ECF No. 24-2 at 1–2; see also 28-1 at 27–28. Wallace said rumor of T.A.'s gun possession was not substantiated or corroborated and T.A. had no felony convictions. ECF No. 24-2 at 3–5. Wallace admitted it was possible one of the Blythe Street gang members visiting the apartment that night was present during the shooting and took a gun from T.A.'s body before fleeing the scene. ECF No. 24-1 at 2–4, 8–9, 13–14.

///

///

///

7

**III. <u>Governing Standards of Review</u>**

    **A. <u>Antiterrorism and Effective Death Penalty Act (AEDPA)</u>**

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a federal court may not grant a petition for a writ of habeas corpus on any claim that was adjudicated on the merits in state court unless the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by United States Supreme Court precedent, or was based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding. 28 U.S.C. § 2254(d).

A state court's decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d)(1), "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent." <u>Lockyer v. Andrade</u>, 538 U.S. 63, 73 (2003) (quoting <u>Williams v. Taylor</u>, 529 U.S. 362, 405–06 (2000), and citing <u>Bell v. Cone</u>, 535 U.S. 685, 694 (2002)). A state court's decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d)(1) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Id.</u> at 75 (quoting <u>Williams</u>, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous . . . [rather] [t]he state court's application of clearly established law must be objectively unreasonable." <u>Id.</u> (quoting <u>Williams</u>, 529 U.S. at 409–12) (internal citation omitted)).

The Supreme Court has held, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." <u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011) (citing <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." <u>Id.</u> at 102 (citing <u>Lockyer</u>, 538 U.S. at 75); <u>see also</u> <u>Cullen v. Pinholster</u>, 563 U.S. 170, 181 (2011)

1   (describing the standard as a "difficult-to-meet" and "highly deferential standard for evaluating
2   state-court rulings, which demands state-court decisions be given the benefit of the doubt."
3   (internal quotation marks and citations omitted)).

4   **B.  Effective-Assistance-of-Counsel**

5          On Petitioner's claims of ineffective assistance of counsel, he must demonstrate (1) the
6   attorney's "representation fell below an objective standard of reasonableness[;]" and (2) the
7   attorney's deficient performance prejudiced the petitioner such that "there is a reasonable
8   probability that, but for counsel's unprofessional errors, the result of the proceeding would have
9   been different." Strickland v. Washington, 466 U.S. 668, 687–88, 694 (1984). "A reasonable
10  probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. It is a
11  petitioner's burden to show "counsel made errors so serious that counsel was not functioning as
12  the 'counsel' guaranteed . . . by the Sixth Amendment." Id. at 687.

13         "[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only
14  the right to effective assistance . . . ." Burt v. Titlow, 571 U.S. 12, 24 (2013). When considering
15  an ineffective assistance of counsel claim, a court "must indulge a strong presumption that
16  counsel's conduct falls within the wide range of reasonable professional assistance . . . ."
17  Strickland, 466 U.S. at 689 (citation omitted). On the performance prong, the issue is not what
18  counsel might have done differently but whether counsel's decisions were reasonable from his or
19  her perspective at the time. Id. at 689–90. A petitioner making an ineffective assistance claim
20  "must identify the acts or omissions of counsel that are alleged not to have been the result of
21  reasonable professional judgment." Id. In considering such claims, a court is obligated to
22  "determine whether, in light of all the circumstances, the identified acts or omissions were outside
23  the wide range of professionally competent assistance." Id. Under Strickland, strategic choices
24  made "after thorough investigation of law and facts relevant to plausible options are virtually
25  unchallengeable." Id. On the other hand, "strategic choices made after less than complete
26  investigation are reasonable precisely to the extent that reasonable professional judgments support
27  the limitations on investigation." Id. at 690–91.

28  ///

9

"Establishing that a state court's application of <u>Strickland</u> was unreasonable under § 2254(d) is all the more difficult" because "[t]he standards created by <u>Strickland</u> and § 2254(d) are both 'highly deferential,'" "and when the two apply in tandem, review is 'doubly so.'" <u>See</u> <u>Richter</u>, 562 U.S. at 105 (internal citations omitted); <u>see also</u> <u>Cheney v. Washington</u>, 614 F.3d 987, 995 (9th Cir. 2010) ("When a federal court reviews a state court's <u>Strickland</u> determination under AEDPA, both AEDPA and <u>Strickland's</u> deferential standards apply; hence, the Supreme Court's description of the standard as 'doubly deferential.'") (citing <u>Yarborough v. Gentry</u>, 540 U.S. 1, 6 (2003)).

## IV. <u>Discussion</u>

### A. <u>Ground A</u>

#### 1. <u>Additional Background</u>

Before opening statements, the state district court granted defense motions to preclude the State's introduction of evidence in its case in chief that Gonzalas (1) "is or ever was a member of a gang," (2) was known by the nickname "Loco," and (3) has tattoos depicting the words "Brown Pride," because such evidence was more prejudicial than probative given the killing was not gang-motivated and the State alleged no gang enhancement. ECF Nos. 21-2 at 12; 21-17 at 3; 21-20 at 3–8; 23-1 at 5–7, 10.

Thereafter, in opening remarks, defense counsel asserted Gonzalas killed T.A. in self-defense and contrasted T.A.'s character, as a known "bully" who carries a gun, with Gonzalas's character as a "decent guy," "a lover not a fighter," and "not a troublemaker." ECF No. 23-1 at 14–15. The State argued those remarks opened the door to the gang-affiliation evidence to rebut Gonzalas's good character. <u>Id.</u> at 32–38. Defense counsel argued, other than a misdemeanor, counsel was unaware of any evidence that would rebut the character evidence "as it was put forth during the opening." <u>Id.</u> The state district court ruled the defense opened the door but maintained its exclusion of the tattoos, and reserved ruling whether to allow the other gang-affiliation evidence because the court wished to "[s]ee where the evidence goes" and "depending on that," it might allow certain rebuttal evidence. <u>Id.</u> at 37–38.

///

Defense counsel presented evidence of Gonzalas's good character by eliciting C.E.'s testimony on cross-examination that Gonzalas was "a calm person" and "a nice guy" who helped her mother clean the house and take care of the children. Id. at 91–92. On the State's redirect examination, defense counsel did not object to C.E.'s testimony that "Brown Pride" is a gang, Gonzalas has "Brown Pride" tattooed on his legs, and she did not know whether Gonzalas was a gang member. ECF No. 23-2 at 12–14, 18. Defense counsel did not object to the State's direct examination eliciting Enriquez's testimony that Gonzalas had "Brown Pride" tattoos written on his legs, and she believed he was "at one point" affiliated with a gang but did not know whether the gang was "Brown Pride." ECF No. 23-3 at 2–3. On cross-examination, the defense elicited Enriquez's testimony that Gonzalas had a reputation in the neighborhood as a "pretty nice guy," she never knew him to be violent, he was extremely good with her kids, and he helped clean the apartment. Id. at 3–4.[8]

Defense counsel later objected to the State playing Gonzalas's video-taped statements to police because in it, Gonzalas suggested he was a current "Sureno," "Southsider," and member of the Brown Latinos Pride (hereinafter "BLP") gang, on the grounds such statements were more prejudicial than probative as Gonzalas was no longer a gang member at the time of the shooting. ECF No. 23-4 at 5–8. The State argued the statements were admissible because the defense opened the door to bad character evidence in opening remarks and cross-examination. Id. at 6–7. The state district court permitted the State to play the interview, including Gonzalas's gang-affiliation statements, for the jury after ruling (1) the door was "opened on cross-examination" "regarding the gang subculture," and "there's a gang implication in this entire event," (2) the words came "directly from the Defendant's mouth," and (3) the statements were "admissible based upon the totality of the information" from the witnesses. Id. at 5–8. Defense counsel thereafter did not object

---

[8] The state district court requested the parties consider an additional instruction on character evidence:

[W]e do as a consequence of the evidence as presented and examination of the witness have to consider additional character evidence instruction. You know, I can look at that or you—but I do believe based upon the statements of the witnesses that start on cross-examination at least regarding gang, we should—and propensity for violence that possible instruction on character evidence is appropriate. So, I'd ask you both to look at that.

ECF No. 23-3 at 41–42. No limiting instruction was provided to the jury. ECF No. 25-8.

to Sergeant Wallace's testimony that witnesses told him "Loco" shot T.A., that an anonymous tip informed him "Loco" was Gonzalas, and that C.E. and Enriquez each identified Gonzalas as "Loco." Id. at 13, 16. Wallace's interview with Gonzalas was played for the jury and photographs of his "Brown Pride" tattoos were admitted without additional objection. Id. at 17–18.

In the defense case in chief, neighbor Rivera testified "Loco" was Gonzalas's nickname and he had a reputation in the neighborhood as a "quiet person," a "calm person" and she thought him "not offensive," "diligent," and a "a good person," who did not seek fights. ECF No. 23-5 at 12–14. Gonzalas testified in his own defense that he acquired his nickname "Loco" when he was seven or eight years old because he mimicked a cowboy character called Pancho Pistolas. ECF No. 25-2 at 7–8. Gonzalas admitted he once belonged to the BLP gang in East Palo Alto, California before moving to Las Vegas and that he had "Brown Pride" tattooed on his legs. ECF Nos. 25-1 at 8; 25-2 at 9. He said he moved to Las Vegas seven years before the shooting because there was "too much violence going on," and he wanted to "change" his life and "get a job." ECF No. 25-1 at 8. He explained that his Las Vegas neighborhood had gangs, and he socialized with gang members, but had "no problems with nobody" and was not a gang member in Las Vegas. Id. at 9. Gonzalas admitted he was arrested for applying "MSK" graffiti in Las Vegas in 2002 but said MSK was "a graffiti crew," which he said is different from a gang. Id. 10–11.

The jury was instructed on the requirements for self-defense. ECF No. 25-8 at 30–39. In closing remarks, neither party argued the shooting was gang-motivated, however, the State, without objection, referred to Gonzalas as "Loco" on 19 occasions and once referred to him as "Loco from the BPL [sic] gang." ECF Nos. 25-3 at 2, 13; 25-4 at 18–19; 25-5 at 1–4, 6.

Although Gonzalas had two trial attorneys, only one testified at the postconviction evidentiary hearing. ECF No. 29-1 at 11, 35. Defense counsel was not asked, and therefore did not explain, the defense strategy for Gonzalas's good character evidence. Id. at 11, 26.

### 2.  Ground A(2)—Opening the Door to Gang Evidence in Opening Remarks

Gonzalas claims his counsel were ineffective under the Sixth Amendment because, after successfully excluding evidence of Gonzalas's gang affiliation, gang tattoos, and nickname, "Loco," counsel opened the door to that evidence in opening remarks by contrasting T.A.'s

reputation as a bully who carried guns with Gonzalas's reputation as a "decent guy," "a lover not a fighter," who did not look for trouble. ECF No. 18 at 12–15.

### a. State Law

Under Nevada law, once a defendant offers evidence of his good character, the State may thereafter offer evidence of his bad character in rebuttal. NRS § 48.045(1)(a); Roever v. State, 963 P.2d 503, 505 (Nev. 1998). After a defendant opens the door to evidence rebutting his good character, "NRS 48.055 allows permissible character evidence to be admitted at trial only in the form of the witness's opinion of the defendant or the defendant's reputation." Id. "Evidence of specific acts is admissible only upon cross-examination or when the defendant's character is an essential element of the charge." Id.

The Nevada Supreme Court has held, however, that the "statutory rules of evidence do not prohibit a party from introducing extrinsic evidence specifically rebutting the adversary's proffered evidence of good character" where the adverse party introduces evidence "giving the jury a false impression" of good character. Jezdik v. State, 110 P.3d 1058, 1065 (Nev. 2005). In that instance, the State is permitted to offer "extrinsic evidence to show a specific contradiction" but such evidence "should squarely contradict the adverse testimony."[9] Id.

---

[9] Gonzalas argued during his state court direct appeal that the trial court's admission of the gang-affiliation evidence warranted reversal because "the government alleged no connection between Mr. Gonzales' prior alleged gang affiliation and the instant homicide." ECF No. at 26-21 at 25 citing, inter alia, Dawson v. Delaware, 503 U.S. 159 (1992) (footnote omitted). The state supreme court affirmed as follows:

> Gonzales contends that the district court abused its discretion in admitting evidence of his gang affiliation because the prosecution never made a connection between the gang affiliation and the crime charged. We disagree.

> Evidence that is obviously prejudicial to a defendant is not admissible unless it is brought into issue by the defendant and the issue raised by the defendant is one to which the prejudicial evidence is relevant. Roever v. State, 114 Nev. 867, 871, 963 P.2d 503, 505 (1998). As a general rule, "'[i]t is error to allow the [prosecution] to impeach a defendant's credibility with extrinsic evidence relating to a collateral matter." Jezdik v. State, 121 Nev. 129, 136–37, 110 P.3d 1058, 1063 (2005) (quoting McKee v. State, 112 Nev. 642, 646, 917 P.2d 940, 943 (1996)).

> However, we have recognized an exception to the collateral-fact rule when a defendant introduces evidence that gives the jury a false impression of the defendant's good character through a denial of misconduct. Id. at 139, 110 P.3d at 1065. This limited exception allows the prosecution to introduce extrinsic evidence specifically rebutting only the defendant's misleading testimony that may have given the jury a false impression of the defendant's good character. Id. at 139, 110 P.3d at 1065.

### b.  **State Court Determination**

The state supreme court determined Gonzalas failed to meet the requirements of either Strickland prong for purposes of his claim that counsel was ineffective in opening the door to bad character evidence:

> To demonstrate ineffective assistance of counsel, a petitioner must show that counsel's performance was deficient, and that prejudice resulted. Strickland v. Washington, 466 U.S. 668, 687–88 (1984); Warden v. Lyons, 100 Nev. 430, 432–33, 683 P.2d 504, 505 (1984) (adopting the test in Strickland). Both components of the inquiry must be shown, Strickland, 466 U.S. at 697, and the petitioner must demonstrate the underlying facts by a preponderance of the evidence, Means v. State, 120 Nev. 1001, 1012, 103 P.3d 25, 33 (2004).

> Gonzalas first argues that counsel should not have opened the door to bad character evidence by praising his good character. The district court's finding that counsel made a strategic choice is supported by the record, and Gonzalas has not shown that the district court's finding is not entitled to deference or that extraordinary circumstances warrant a challenge to counsel's strategic choice. See Lara v. State, 120 Nev. 177, 180, 87 P.3d 528, 530 (2004) ("[T]rial counsel's strategic or tactical decisions will be virtually unchallengeable absent extraordinary circumstances." (internal quotation marks omitted)). Gonzalas has not shown prejudice when he conceded that he shot the victim and contrasting his good character with the victim's violent character was critical to his self-defense claim. See NRS 200.200(1). Accordingly, we conclude that Gonzalas has not shown that trial counsel was ineffective and that the district court therefore did not err in denying this claim.

ECF No. 29-23 at 3–4.

### c.  **Disposition of Ground A(2) Based on Strickland Performance Prong**

The state supreme court's application of Strickland's performance prong to the state court record was objectively reasonable under the totality of the circumstances. The record supports the conclusion that defense counsel reasonably chose to present evidence of Gonzalas's good character to support Gonzalas's credibility for the self-defense claim, even if the State was then permitted

---

We conclude that the district court did not abuse its discretion in admitting evidence of Gonzales's alleged gang affiliation because Gonzales opened the door to this line of questioning based on his statements of character in his opening statement. NRS 48.045(1)(a). During his opening statement, Gonzales remarked, that he was known as a lover not a fighter, a decent guy, not a troublemaker, and that people liked him and he likes people. These statements were misleading in the sense that it may have given the jury a false impression of his character. Therefore, the limited exception to the collateral-fact rule applies, and the district court did not abuse its discretion in allowing the prosecution to specifically rebut Gonzales's statement with evidence of his gang affiliation. Thus, we conclude that the district court did not abuse its discretion in admitting evidence of Gonzales's alleged gang affiliation.

ECF No. 27-6 at 8–10. It does not appear that Gonzalas sought certiorari from the Supreme Court following the state supreme court's affirmance on direct appeal.

to present evidence of Gonzalas's prior gang affiliation. The state court record shows counsel initiated this strategy in opening remarks pitting Gonzalas's peaceful character against T.A.'s violent character and argued Gonzalas acted in self-defense and did not plan to murder T.A. Next, although warned that the State would seek to present gang-affiliation evidence should counsel present good character evidence, defense counsel elicited C.E.'s testimony about Gonzalas's good character. And, although the state district court had not yet ruled whether the defense had opened the door to gang-affiliation evidence, defense counsel did not object to the State's redirect examination eliciting C.E.'s testimony about Gonzalas's gang affiliation and gang tattoos. Likewise, counsel did not object to the State's direct examination eliciting Enriquez's testimony about Gonzalas's gang affiliation and tattoos, or Sergeant Wallace's testimony that witnesses identified the shooter as "Loco," and that "Loco" was Gonzalas. Finally, in the defense case in chief, counsel elicited Rivera's testimony about Gonzalas's good character. See, supra, at pp. 3–4, 12. Although counsel objected to the admission of Gonzalas's statements to police concerning his gang-affiliation, the substance of that objection was that the statements were more prejudicial than probative because they suggested Gonzalas was a gang member at the time of the shooting. The record of counsel's actions suggests counsel's strategy was to call Gonzalas as a witness to explain that he had transformed his life, was no longer a gang member at the time of the shooting, and that "Loco" was a childhood nickname and not a gang moniker.

There is nothing objectively unreasonable about precluding evidence before trial as a stopgap measure and subsequently changing the defense strategy in opening statements. And, under these circumstances, it was objectively reasonable for counsel to pursue a good character strategy to attempt to persuade the jury that Gonzalas was a peaceful individual who acted in self-defense and then strengthen that portrayal by contradicting and diffusing the State's rebuttal gang-affiliation evidence with Gonzalas's explanation that he had not been affiliated with a gang for seven years, and "Loco" was his childhood nickname.

The record also supports the finding that the good character strategy was objectively reasonable under the totality of the circumstances. Martin's testimony suggested Gonzalas and Mojica may have agreed to kill T.A. a month prior to the shooting, and Gonzalas testified he

obtained the shotgun used to kill T.A. just hours before heading to T.A.'s apartment. Gonzalas claimed T.A. raised his shirt and showed Gonzalas he had a gun while threatening to kill him prior to their fistfight, but no one else saw T.A. with a gun during that confrontation and police found no gun attributable to T.A. Gonzalas claimed he shot T.A. in self-defense because he saw T.A. reaching for the gun that T.A. had displayed before the fist fight, but Gonzalas admitted he did not see a gun in T.A.'s hand when he shot him, and Enriquez testified T.A.'s hands were empty. Martin's testimony that Gonzalas laughed and wondered whether T.A. was dead while they drove away after the shooting suggested Gonzalas lacked remorse. See, supra, pp. 3–7.

On this record, the state supreme court's application of Strickland's performance prong was objectively reasonable and precludes federal habeas relief for ground A(2). However, because jurists of reason could find it debatable whether on this record counsel's opening the door to rebuttal character evidence constitutes deficient performance, the Court will grant a certificate of appealability as to ground A(2). See Slack v. McDaniel, 529 U.S. 473, 484 (2000).

### 3. Ground A(3)—Failure to Object to Gang Evidence Under the First Amendment.

Gonzalas claims counsel were ineffective under the Sixth Amendment because they failed to object to the introduction of the gang-affiliation evidence on the grounds that doing so violated Gonzalas's right to free association guaranteed by the First Amendment as set forth in Dawson v. Delaware, 503 U.S. 159 (1992). ECF No. 18 at 15–17.

Gonzalas did not raise this claim in his postconviction proceedings. ECF No. 27-31. Respondents moved to dismiss this claim as unexhausted. ECF No. 20. Gonzalas argued the claim is technically exhausted and procedurally defaulted, but he can overcome the default as proscribed by Martinez v. Ryan, 566 U.S. 1 (2012). ECF No. 30 at 6–13. This Court deferred ruling because the analysis under Martinez is intertwined with the merits. ECF No. 35 at 6.

### a. Procedural Default Under Martinez

"A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from the violation of federal law." Trevino v. Thaler, 569 U.S. 413, 421 (2013) (citing Martinez, 566 U.S. at 10 (citation omitted)). A procedural default of a claim of ineffective assistance of trial counsel may be excused for "cause" where (1) the claim of ineffective assistance

of trial counsel is substantial; (2) there was no counsel or counsel was ineffective during the state collateral review proceeding; (3) the state collateral review proceeding was the initial review proceeding for the ineffective-assistance-of-trial-counsel claim; and (4) state law requires ineffective assistance of trial counsel claims be raised in an initial-review collateral proceeding. See Trevino, 569 U.S. at 423 (citing Martinez, 566 U.S. at 13–15). The failure to meet any of these four prongs renders the Martinez exception unavailable to excuse a procedural default.

To show a claim is "substantial" under Martinez, a petitioner must demonstrate the underlying ineffectiveness claim has "some merit." See Martinez, 556 U.S. at 14. That is, the petitioner must submit at least some evidence tending to show trial counsel performed deficiently, and counsel's deficient performance harmed the defense. See Strickland, 466 U.S. at 695–96.

### b.  Character Evidence Under Dawson

In Dawson, the Supreme Court held the admission of a defendant's beliefs and association at sentencing violates the First Amendment where it has "no relevance to the sentencing proceeding."[10] 503 U.S. at 166. There, the State introduced evidence at a capital sentencing proceeding of the petitioner's affiliation with the Aryan Brotherhood and tattoos suggesting his membership and his belief that he was a disciple of Satan. Id. at 162. The State introduced a stipulation that read: "The Aryan Brotherhood refers to a white racist prison gang that began in the 1960's in California in response to other gangs of racial minorities. Separate gangs calling themselves the Aryan Brotherhood now exist in many state prisons including Delaware." Id. The Supreme Court held the evidence was inadmissible because it "was not tied in any way" to the crimes at issue and the State did not present evidence that the Aryan Brotherhood had committed any unlawful or violent acts. Id. at 166. The Supreme Court rejected application of a "principle of

---

[10] The Ninth Circuit has applied Dawson to the guilt phase of capital and non-capital trials. See Kipp v. Davis, 971 F.3d 866, 874, 876–77 (9th Cir. 2020) (concluding even if the state's admission during the guilt phase of his trial of Kipp's references to Satan violated his First Amendment rights, the error did not have a "substantial and injurious effect or influence in determining the jury's verdict" as the evidence supporting the conviction was overwhelming) (citations omitted); Schneider v. McDaniel, 674 F.3d 1144, 1147–50 (9th Cir. 2012) (concluding even if the state trial court's admission of codefendant's testimony about Aryan Warriors and Aryan Brotherhood during non-capital trial was error under Dawson, it was harmless as the government offered significant direct evidence of guilt); Bennett v. Deeds, 34 F.3d 1071 (9th Cir. 1994) (concluding admission of gang affiliation evidence at trial did not violate First Amendment rights where jury could draw permissible inferences from that evidence).

broad rebuttal" that would have allowed introduction of the evidence as "bad" character evidence to rebut Dawson's good character evidence. Id. at 167–68. "[B]ecause the evidence proved nothing more than Dawson's abstract beliefs," and "was employed simply because the jury would find these beliefs morally reprehensible," its introduction violated Dawson's First Amendment rights to free association. Id.

### c.  **Disposition of Ground A(3)**

Gonzalas cannot demonstrate cause to set aside his procedural default for this claim under the circumstances because he cannot establish, as required by Strickland's prejudice prong, a reasonable probability that the result of the proceedings would have been different had trial counsel objected and the gang-affiliation evidence been excluded under Dawson.

Gonzalas's testimony that he shot T.A. in self-defense was not substantially corroborated. Gonzalas claimed he shot T.A. when T.A. reached for a gun to shoot him, but none of the other witnesses saw T.A. with a gun during the confrontation that precipitated the shooting. Police found a large knife in T.A.'s back pocket, but they found no gun on T.A., in his apartment, or at the scene. Although C.E. testified she saw T.A. with a gun earlier that night, she said she fell asleep long before the shooting. Codefendant Mojica stated she "felt" a gun when she hugged T.A., but she did not say she saw T.A. with a gun. And although Enriquez, C.E., and Rivera each believed T.A. possessed a gun, Sergeant Wallace testified the rumor of T.A.'s gun possession was uncorroborated. Gonzalas's argument that someone took the gun was speculative and unsupported by evidence. See, supra, at pp. 2–7.

On the other hand, there was strong evidence contradicting the self-defense theory. Martin testified that Gonzalas and Mojica had previously talked about killing T.A., that Gonzalas may have agreed to do so, and that Gonzalas obtained the shotgun used to kill T.A. hours before the killing. Gonzalas testified he grabbed the gun from Mojica and shot T.A. immediately after fist fighting with T.A. The medical examiner testified T.A. died from three shotgun wounds, including close-range shotgun wounds to his cheek and head. Martin testified Gonzalas exhibited a lack of remorse in the car after the shooting by laughing, asking whether T.A. was dead, and hiding the shotgun. Although several people witnessed the shooting, Gonzalas initially denied involvement

when questioned by Sergeant Wallace, and Wallace testified he planted the self-defense idea in Gonzalas's mind during the interview to minimize Gonzalas's culpability in Gonzalas's own mind so Gonzalas would tell the truth about the shooting. See, supra, pp. 3–7. In closing remarks the State once referred to Gonzalas as "Loco from the BPL [sic] gang," but the evidence demonstrated the shooting was not gang motivated. And although the State repeatedly referred to Gonzalas as "Loco" in closing argument, Gonzalas testified "Loco" was a childhood nickname.

On this record, Gonzalas cannot establish trial counsel's failure to object, or postconviction counsel's failure to raise an ineffective assistance of trial counsel claim, constitutes prejudicial ineffective assistance, for purposes of setting aside the procedural default of this claim under Strickland and Martinez. However, because jurists of reason could find it debatable on the record presented whether postconviction counsel was ineffective in failing to assert that trial counsel were ineffective in failing to challenge the admission of the gang-affiliation evidence as rebuttal character evidence under Dawson, the Court will grant a certificate of appealability as to Ground A(3). See Slack, 529 U.S. at 484.

**B. Ground B**

**1. Additional Background**

On Monday, December 3, 2007, counsel for codefendant Mojica disclosed Brandan Contreras, Alicia Rivera, and others, as trial witnesses for her case.[11] ECF No. 21-16. The next day, Gonzalas's trial counsel filed a supplemental witness notice disclosing Rivera, but not Contreras, as a witness for Gonzalas's trial. ECF No. 21-18. On Wednesday, December 5, 2007, at calendar call, the state district court noted there were "sixty people downstairs filling out a questionnaire right now" for the trial. ECF No. 21-20 at 3. During that calendar call, the State objected that Gonzalas had failed to provide contact information for his timely-noticed witnesses and the state district court warned defense counsel that witness notices could be struck if inappropriate. Id. at 8–9. Defense counsel notified the state district court that the supplemental

---

[11] The Notice of Witnesses was file-stamped with the date November 3, 2007; however, counsel's signature date is December 3, 2007. ECF No. 21-16.

witness for Rivera was a day late,[12] however, the State had no objection to Rivera testifying at trial. Id. at 10–11. At the same hearing, co-defendant Mojica entered an Alford plea, and her trial was vacated. Id. at 11–16; see supra, n.5.

Five days later, on the first day of trial, while the venire awaited jury selection, Gonzalas's trial counsel provided Contreras's statement to the State and requested leave to call Contreras as a character witness although Contreras was never noticed as a defense witness for Gonzalas. ECF No. 22-1 at 16–17. Counsel explained Contreras was not a percipient witness and was not previously implicated in the case; however, codefendant Mojica's attorneys obtained Contreras's statement on September 6, 2007. Id. Counsel explained that he reviewed Contreras's statement over the weekend and that Contreras "had been threatened and terrorized by the alleged victim in this case on prior occasions and that was the sum of the statement . . . ." Id. The State objected that defense counsel "had every right to do any type of investigation they chose to in terms of also contacting the other attorney that represented [Mojica]" and the untimely disclosure left the State without advance notice to investigate whether "reports were filed and what not." Id. at 16–18. The state district court said it would rule on the issue after it reviewed Contreras's statement.[13] ECF No. 22-1 at 18; see also 22-9 at 9.

At lunchtime on the second day of trial, the State raised its objection to Contreras's testimony on the grounds that the State was entitled by statute to five-days-notice to investigate and it did not have the means to do so. ECF No. 23-2 at 19, 23–24, 26–27. Defense counsel pointed out that the State called the victim's mother to testify without giving any notice, although the

---

[12] In Nevada, the parties to a felony matter must file and serve written notices of the names and addresses of witnesses they intend to call during their respective cases in chief "not less than 5 judicial days before trial or at such other time as the court directs." NRS § 174.234(1)(a)(1). If a party later determines it intends to call an additional witness in its case in chief, it must file and serve written notice as soon as practicable after determining it intends to call that witness. Id. A court "shall prohibit an additional witness from testifying if the court determines that the party acted in bad faith by not including the witness on the written notice required pursuant to subsection 1." Id. A party's failure to comply with discovery rules permits a trial court to "order the party to permit the discovery or inspection of materials not previously disclosed, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed," or "order as it deems just under the circumstances." NRS § 174.295(2).

[13] The state court record as presented to this Court indicates Contreras's statement was neither marked as a court exhibit at trial nor presented to the state appellate courts during the direct appeal or in collateral review proceedings. See e.g., ECF No. 22-1 at 4. The parties did not include Contreras's statement in the record presented to this Court and Petitioner indicated he could not locate it. See ECF Nos. 51–52.

defense did not object. Id. at 24. Counsel further pointed out that the State failed to abide by the 15-day statutory notice required for its motion to use preliminary hearing testimony for a witness, although the State ultimately located that witness. Id. at 25. Counsel had just argued the defense theory was "self-defense," which permitted testimony about the victim's "reputation and specific acts" "provided they were known by [Gonzalas]" as relevant to Gonzalas's "state of mind" in support of the claim of self-defense." Id. at 23. Counsel proffered that Contreras was a 7-Eleven clerk who would testify that T.A. "used to come in here and jack beer all the time," that T.A "threatened" Contreras, and in Contreras's opinion, T.A. was a "threatening man who uses his size to threaten and make people feel in harm." Id. at 26. The State argued the notice was last minute and there was no basis for the delay because the statement was provided to Mojica's counsel in August or September and Mojica and Gonzalas did not have competing interests. Id. at 26–27. The court stated it must "balance the equities," would "read" the statement, and would rule after lunch. Id.

After lunch, defense counsel said he received Contreras's statement from Mojica's counsel the same day that he filed the supplemental notice for Rivera (the Tuesday before trial) but did not notice Contreras as a witness because counsel did not have time to review Contreras's statement until the following weekend. Id. at 27–28. The state district court, considering that one witness was noticed and the other was not, excluded Contreras's testimony because he hadn't been properly noticed, and consequently there was no investigation. Id. Counsel admitted he failed to "do a proper job" as he "failed to do this earlier." Id. at 29.

In the postconviction evidentiary hearing, defense counsel testified it was his understanding Contreras would testify that T.A stole beer from the 7-Eleven where Contreras worked, but counsel had not talked with Contreras. ECF No. 29-1 at 47–48.

### 2. **Additional Legal Principles**

The Supreme Court has held "[t]he right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies" and that a defendant's right to present his own witnesses to establish a defense "is a

fundamental element of due process of law." <u>Washington v. Texas</u>, 388 U.S. 14, 19 (1967); <u>see also</u> <u>In re Oliver</u>, 333 U.S. 257, 273–74 (1948) ("A person's . . . right to his day in court . . . and . . . to offer testimony is basic in our system of jurisprudence . . . ."). "[T]he right to present relevant testimony is not without limitation. The right 'may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.'" <u>Michigan v. Lucas</u>, 500 U.S. 145, 149 (1991) (quoting <u>Rock v. Arkansas</u>, 483 U.S. 44, 55 (1987), in turn quoting <u>Chambers v. Mississippi</u>, 410 U.S. 284, 295 (1973)). "Restrictions on a criminal defendant's rights to confront adverse witnesses and to present evidence 'may not be arbitrary or disproportionate to the purposes they are designed to serve.'" <u>Lucas</u>, 500 U.S. at 151 (citing <u>Rock</u>, 483 U.S. at 56).

In <u>Taylor v. Illinois</u>, the Supreme Court held a trial court's refusal to allow a defense witness to testify as a sanction for failing to timely identify that witness in response to a pretrial discovery request may violate the Compulsory Process Clause of the Sixth Amendment. 484 U.S. 400, 409 (1988). In <u>Taylor</u>, defense counsel disclosed a witness after the parties presented opening statements and two of the State's witnesses had testified. <u>Id.</u> at 403–04. The witness testified outside the presence of the jury that he met with counsel before trial, knew the defendant for only four months, and did not witness the incident. <u>Id.</u> at 404–05. The trial court excluded the witness's testimony finding the witness's veracity was doubtful and the failure to timely disclose the witness was a blatant and willful discovery violation that was designed to obtain a tactical advantage as defense counsel had violated discovery rules in that court in prior cases. <u>Id.</u> The Supreme Court held the preclusion did not violate the Compulsory Process Clause, "[i]n view of the fact that petitioner's counsel had actually interviewed [the witness] during the week before the trial began" but failed to include that witness in his witness disclosure on the first day of trial in which counsel disclosed two other witnesses, because the circumstances led to an "inescapable" inference that counsel sought a tactical advantage with his belated disclosure. <u>Id.</u> at 416–17. The Supreme Court rejected the defendant's argument that, under the Compulsory Process Clause of the Sixth Amendment, "preclusion is *never* a permissible sanction for a discovery violation." <u>Id.</u> at 414 (emphasis in original). The Supreme Court noted that alternative sanctions would be "adequate and appropriate in most cases" but there could be circumstances, such as in that case,

where preclusion was justified because a less severe penalty "would perpetuate rather than limit the prejudice to the State and the harm to the adversary process." Id. at 413. The Supreme Court explained:

> A trial judge may certainly insist on an explanation for a party's failure to comply with a request to identify his or her witnesses in advance of trial. If that explanation reveals that the omission was willful and motivated by a desire to obtain a tactical advantage that would minimize the effectiveness of cross-examination and the ability to adduce rebuttal evidence, it would be entirely consistent with the purposes of the Compulsory Process Clause simply to exclude the witness' testimony.

Id. at 415 (footnote and citation omitted). The Supreme Court concluded that, "[r]egardless of whether prejudice to the prosecution could have been avoided" by a lesser penalty, "the severest sanction [wa]s appropriate" in that instance. Id.

The Supreme Court in Taylor declined to "draft a comprehensive set of standards to guide the exercise of discretion in every possible case" involving the sanctioning of discovery violations; but stated that it is "elementary" for trial courts to consider: (1) "the fundamental character of the defendant's right to offer the testimony of witnesses in his favor[;]" (2) "the integrity of the adversary process, which depends both on the presentation of reliable evidence and the rejection of unreliable evidence[;]" (3) "the interest in the fair and efficient administration of justice[;]" and (4) "the potential prejudice to the truth-determining function of the trial process." Id. at 414–15, n.19 (citing e.g., Fendler v. Goldsmith, 728 F.2d 1181, 1188–90 (9th Cir. 1983) (considering the effectiveness of less severe sanctions, the impact of preclusion on the evidence at trial and the outcome of the case, the extent of prosecutorial surprise or prejudice, and whether the violation was willful)).

### 3.  Ground B(2)—Trial Court's Preclusion of Contreras's Testimony

Gonzalas claims the state district court's preclusion of the testimony of Brandon Contreras violated his right to present witnesses in his own defense as guaranteed by the Sixth Amendment. ECF No. 18 at 17–19.

The state supreme court held the state district court did not abuse its discretion when, rather than grant a trial continuance, it precluded Contreras's testimony, because although the testimony

would have been helpful to the defense, defense counsel inexplicably failed to pursue the witness's testimony and permitting the testimony would have resulted in unfair surprise to the State:

> "[We] review [] a district court's decision whether to allow an unendorsed witness to testify for abuse of discretion." Mitchell v. State, 124 Nev. ___, ___, 192 P.3d 721, 729 (2008) (citing Mulder v. State, 116 Nev. 1, 12–13, 992 P.2d 845, 852 (2000); Dalby v. State, 81 Nev. 517, 519, 406 P.2d 916, 917 (1965)).

> "When addressing discovery violations, the district court must be cognizant that defendants have the constitutional right to discredit their accuser, and this right 'can be but limitedly circumscribed.'" Sampson v. State, 121 Nev. 820, 827, 122 P.3d 1255, 1260 (2005) (quoting Reese v. State, 458 A.2d 492, 496 (Md. Ct. Spec. App. 1983)). "Therefore, to protect this constitutional right, there is a strong presumption to allow the testimony of even late-disclosed witnesses, and evidence should be admitted when it goes to the heart of the case." Id. Further,

>> [i]t may well be true that alternative sanctions are adequate and appropriate in most cases, but it is equally clear that they would be less effective than the preclusion sanction and that there are instances in which they would perpetuate rather than limit the prejudice to the State and the harm to the adversary process.

> Taylor v. Illinois, 484 U.S. 400, 413 (1988).

> In Jones v. State, we held that "Nevada case law establishes that failure to endorse a witness constitutes reversible error only where the defendant has been prejudiced by the omission." 113 Nev. 454, 473, 937 P.2d 55, 67 (1997) (citing Redmen v. State, 108 Nev. 227, 234, 828 P.2d 395, 400 (1992), overruled on other grounds by Alford v. State, 111 Nev. 1409, 906 P.2d 714 (1995)). Further, this court presumes that if a prosecutor calls an unendorsed witness to testify, the prosecutor was not previously aware of the witness. Id. at 472, 937 P.2d at 67.

Exclusion of Brandon Contreras's testimony

Gonzales argues that the exclusion of Brandon Contreras's testimony violated Nevada law as well as his state and federal constitutional rights. Although Gonzales admits that he was late noticing Contreras, he argues that the district court's exclusion of his key witness was an extreme discovery sanction. Gonzales contends that had the jury heard Contreras confirm Gonzales's fears about [T.A.], the verdict may have been different. We disagree.

We conclude that the district court did not abuse its discretion by denying Gonzales's request to introduce Contreras as a witness rather than granting a continuance. The State did not anticipate Contreras as a witness and, although the testimony Gonzales sought to admit may have been helpful to his defense, it would have resulted in an unfair surprise to the State. See Sampson v. State, 121 Nev. 820, 828, 122 P.3d 1255, 1260 (2005) (holding that unfair surprise would have resulted from the district court allowing a witness to testify who was noticed late to the State because of an error in the spelling of the witness's name). Fairness during trial is not one-sided and applies to both Gonzales and the State. The fault here lies not with the district court, but instead with Gonzales's counsel, who inexplicably failed to timely pursue testimony from Contreras. Thus, we conclude that the district court did not abuse its discretion in excluding Contreras's testimony.

///

24

ECF No. 27-6 at 4–5. Based on deferential review, the state supreme court's determination was neither contrary to, nor an unreasonable application of Supreme Court authority, and does not constitute an unreasonable determination of the facts on this state court record.

The record reflects the state district court reasonably considered the "facts and equities," and Contreras's statement, and precluded the testimony based on the lack of notice and consequent deprivation of the State's ability to investigate Contreras's story and thereby test the reliability of his testimony. Similar to counsel in <u>Taylor</u>, the record shows that Gonzalas's counsel possessed Contreras's statement before trial and at the time that counsel disclosed another witness (Rivera), yet counsel failed to disclose Contreras. After receiving Contreras's statement, Gonzalas's counsel waited approximately five days and until the morning of jury selection before disclosing Contreras as a witness. As the State pointed out, defense counsel failed to explain why counsel was unaware of Contreras given that counsel for codefendant Mojica had obtained Contreras's statement several months before the trial. The state supreme court reasonably applied <u>Taylor</u> to the facts in the record in its determination that the state district court's exclusion of witness Contreras did not violate Gonzalas's right to compulsory process as the state supreme court's analysis reasonably encapsulated the <u>Taylor</u> factors. Accordingly, Gonzalas is not entitled to federal habeas relief for ground B(2).

The Court will, however, issue a certificate of appealability for Ground B(2) because jurists of reason could find the Court's denial of Ground B(2) either debatable or incorrect. While it is true that the State lacked notice that Gonzalas planned to call Contreras to testify at his trial, Contreras's statement was not entirely a surprise to the State. The state court record indicates codefendant Mojica's counsel timely disclosed Contreras and his statement to the State before trial.[14] ECF No. 21-16. In addition, although nothing in the record suggests Contreras was "unbiased" or "independent," defense counsel's proffer indicates that, unlike other witnesses who testified about T.A.'s character and acts of violence, Contreras would have been the only witness who might have testified that he personally was a victim of T.A.'s threats and violent acts. As

---

[14] On December 5, 2007, the State denied that it received any witness disclosures from Mojica's counsel. ECF No. 21-20 at 8–9.

such, jurists of reason might conclude the unfair surprise and prejudice to the State is unreasonably exaggerated, and that exclusion based on Gonzalas's late notice was unconstitutionally arbitrary or disproportionate in light of the relative importance of Contreras's testimony for Gonzalas's self-defense theory. See Slack, 529 U.S. at 484.

#### 4.   Ground B(3)—Counsel's Failure to Timely Notice Contreras as a Witness

Gonzalas claims trial counsel were ineffective under the Sixth Amendment because they failed to investigate and timely notice Contreras as a witness. ECF No. 18 at 19–21.

The state supreme court determined Gonzalas failed to establish prejudice under Strickland:

> [G]onzalas argues that counsel should have timely noticed potential defense witness Mr. Contreras. The district court found that this witness's anticipated testimony would have addressed topics discussed by other witnesses. Gonzalas has not shown that this finding is not entitled to deference. We note that Contreras was not a witness to the incident itself. While counsel may have performed deficiently in failing to timely notice this witness before trial, we conclude that Gonzalas has not shown prejudice when several other witnesses testified regarding the same aspects of the victim's character such that Contreras's testimony would have been duplicative. *See Elam v. Denney*, 662 F.3d 1059, 1065 (8th Cir. 2011) (observing that the "failure to present cumulative evidence does not constitute ineffective assistance of counsel" (quotation marks omitted)). The district court therefore did not err in denying this claim.

ECF No. 29-23 at 3.

Applying deferential review, the state court record supports the state supreme court's application of Strickland's prejudice prong and its determination there was no reasonable probability the result of the proceedings would have been different had Contreras testified, as counsel proffered, at trial. The proffer for Contreras's testimony about T.A.'s character for threats and thievery would have duplicated the testimony of Gonzalas, Mojica, Enriquez, Trejo, and Rivera, who testified about T.A.'s size, threatening behavior, acts of violence, and reputation for thievery. Moreover, nothing in defense counsel's proffer of Contreras's testimony indicates Contreras ever saw T.A. with a gun and Contreras was not a percipient witness to the shooting, so he could not offer testimony supporting the self-defense theory that T.A. had a gun and reached for it just before Gonzalas shot him. Because the state supreme court's application of Strickland's

prejudice prong was objectively reasonable, Gonzalas is not entitled to federal habeas corpus relief for ground B(3).

The Court will, however, issue a certificate of appealability for Ground B(3) because jurists of reason could find the Court's denial of Ground B(3) either debatable or incorrect. According to defense counsel's proffer, Contreras, unlike the other witnesses, was a direct victim of T.A.'s threats and violence. As a direct victim of T.A.'s violence, Contreras might have provided persuasive support for Gonzalas's self-defense claim, i.e., that the State failed to disprove that he reasonably believed there was an imminent danger that T.A. would either kill him or cause him great bodily harm, and that it was absolutely necessary to use self-defense force or means that might cause the death of T.A. to avoid death or great bodily injury. See Slack, 529 U.S. at 484; see also ECF No. 25-8 at 32–39.

**IV. Conclusion**

**IT IS THEREFORE ORDERED** that the amended petition (ECF No. 18) is **DENIED** in its entirety.

**IT IS FURTHER ORDERED** that a Certificate of Appealability is **GRANTED** for grounds A(2), A(3), B(2), and B(3).

**IT IS FURTHER ORDERED** that the Clerk of Court is directed to substitute Jeremy Bean, Ronald Oliver, Julie Williams, and James Scally, for Respondent Brian Williams.

**IT IS FURTHER ORDERED** that the Clerk shall enter judgment and close this case.

DATED this 27th day of January, 2023.

_____
RICHARD F. BOULWARE, II
UNITED STATES DISTRICT JUDGE